UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| SUSAN A. CURTIS | ) | |
| (Social Security No. XXX-XX-1801), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:08-cv-42-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF  SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United
States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 10,
22) and an Order of Reference entered by District Judge Richard L. Young on
March 4, 2009 (Docket No. 33).

## I.  Statement of the Case

Plaintiff, Susan A. Curtis, seeks judicial review of the final decision of the
agency, which found her not disabled and, therefore, not entitled to Disability
Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§
416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this
action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on September 2, 2005, alleging disability since
May 27, 2005.  (R. 44-47).  The agency denied Plaintiff's application both initially

and on reconsideration.  (R. 30-35, 38-40).  Plaintiff appeared and testified at a
hearing before Administrative Law Judge Ann Pritchett ("ALJ") on September 13,
2007.  (R. 390-415).  Plaintiff was represented by an attorney; also testifying was
a vocational expert.  (R. 390).  On October 18, 2007, the ALJ issued her opinion
finding that Plaintiff was not disabled because she retained the residual
functional capacity ("RFC") to perform her past relevant work.  (R. 11-23).  The
Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision
as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a),
404.981.  Plaintiff then filed a Complaint on March 24, 2008, seeking judicial
review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on September 25, 1959, Plaintiff was 48 years old at the time of the
ALJ's decision, with a high school education.  (R. 393).  Her past relevant work
experience included jobs as an assembler and office clerk.  (R. 394).

### B.  Medical Evidence

On October 21, 2002, Plaintiff underwent an MRI of her brain which
revealed white matter lesions and it was noted that "[m]igraine headaches can be
associated with white matter lesions . . . ."  (R. 260).

Plaintiff was examined by Satish K. Shah, M.D., on March 18, 2003, and
he found that Plaintiff suffered from recurrent migraine headaches that occur
several times a week and can last for 24 hours.  (R. 249).  He noted that

Plaintiff's thyroid, sedimentary rate, rheumatoid factors, and ANA were all normal.  (R. 249).

Dr. Shah saw Plaintiff again on June 6, 2003.  (R. 248).  He noted that Plaintiff suffered from periodic headaches, difficulty focusing, low back pain, and multiple joint pain.  (R. 248).  On July 19, 2003, an EEG revealed abnormal results which "may suggest underlying tendencies for seizures."  (R. 259).  On August 25, 2003, Dr. Shah noted a second abnormal MRI of Plaintiff's brain that demonstrated bilateral white matter lesions.  (R. 246).

Dr. Shah again examined Plaintiff on September 10, 2003, where he noted Plaintiff's abnormal MRI, headaches, and cognitive dysfunction.  (R. 245).  He noted that a spinal tap was unremarkable for multiple sclerosis.  (R. 245).  Dr. Shah referred Plaintiff to Vanderbilt University for evaluation of her abnormal MRI.  (R. 245).  Dr. Shah again examined Plaintiff on November 3, 2003.  (R. 244).  Dr. Shah noted that Plaintiff's recurring headaches were better with use of Depakote.  (R. 244).  He noted an abnormal MRI of Plaintiff's brain.  (R. 244).

On December 16, 2003, Harold Moses, Jr., M.D., reported his results from an evaluation of Plaintiff at Vanderbilt University.  (R. 333-35).  He ruled out multiple sclerosis and demyelinating disease.  (R. 334).  He opined that Plaintiff's MRI results are consistent with people who suffer from migraine headaches, that her joint pains and fatigue "may be suggestive of fibromyalgia, and that her sleepiness, irritability, and abnormal EEG were suggestive of seizure activity." (R. 334).

On January 21, 2004, Plaintiff was seen by Stanley Tretter, M.D. (R. 304-06). He noted Plaintiff's treatment at Vanderbilt by Dr. Moses, as well as her past treatment by Dr. Shah. (R. 304). Dr. Tretter revealed that Plaintiff was diagnosed with fibromyalgia and it was recommended that she be treated for this impairment. (R. 304). Plaintiff reported pain in her shoulder, elbows, lower back, and knees. (R. 304).

Plaintiff was examined by Dr. Tretter on January 24, 2005, with complaints of urinary incontinence, extreme fatigue, and depression, as well as right shoulder pain and difficulty focusing her eyes. (R. 298-99). An MRI of the lumbar spine was normal. (R. 357).

On February 8, 2005, Plaintiff presented at Memorial Hospital for pain associated with a recent automobile accident. (R. 290-91). She complained of pain in her neck and tingling in her hands. (R. 290). She reported a history of migraine headaches with constant headaches since the accident and also blurred vision and dizziness. (R. 290). X-rays and an MRI of her neck were negative. (R. 290). She was prescribed a program of exercises and posture to improve range of motion. (R. 291).

On April 25, 2005, Plaintiff consulted Steven Rupert, D.O. (R. 324-25). She suffered from right hip and leg pain, as well as cervical pain. On April 29, 2005, Dr. Rupert opined that Plaintiff's cervical facet joints were the source of her back pain, her headaches, and her upper extremity pain. (R. 315).

On May 26, 2005, Plaintiff was seen by Dr. Tretter.  (R. 274-75).  Plaintiff had multiple problems including depression and generalized anxiety; Plaintiff also complained of "blackouts."  (R. 274).  Plaintiff also suffered from neck and low back pain.  (R. 274).  She underwent nerve blocks which she explained helped her headaches but resulted in little relief for her neck or back.  (R. 274).

On August 31, 2005, Dr. Tretter treated Plaintiff for depression and knee and hand pain.  (R. 265-66).  Her Cymbalta was no longer working for her depression.  (R. 265).  He noted that Plaintiff's depression, joint pain, and muscle pain were consistent with her diagnosis of fibromyalgia.  (R. 266).

On October 5, 2005, Plaintiff was treated by Dr. Rupert with interarticular facet joint injections for her low back pain.  (R. 178-80).  Her pain improved from a 6/10 to a 0/10.  (R. 179).  On October 19, 2005, Dr. Rupert treated Plaintiff with median branch blocks which garnered similar results.  (R. 181-82).

On November 17, 2005, Plaintiff was again evaluated by Dr. Tretter.  (R. 169-70).  Dr. Tretter noted that Plaintiff needed to quit smoking.  (R. 170).  He also opined that Plaintiff's fibromyalgia and degenerative disc disease were impairments that could be chronic and may persist despite efforts at treatment.  (R. 170).

On December 9, 2005, Plaintiff was evaluated at the request of the Indiana Disability Determination Bureau by Shaner Gable, Ph.D., and Carolyn Hines, M.Ed., Ph.D.  (R. 209-14).  She was found to suffer from adjustment disorder with mixed anxiety and depressed mood.  (R. 214).  It was the doctors' opinion

that Plaintiff demonstrated moderate deficits in abstract thinking, judgment, and insight.  The doctors further stated:

> Client's immediate and remote memory are intact.  Recent memory exhibits moderate deficits.  Calculation skills demonstrate mild deficits.  Her performance on digit span is below average, with a significant difference between Digits Forward and Backward, indicating problems with working memory.  It is felt that inability to concentrate, rather than working memory deficits, were responsible for her performance.  Processing speed was average.

(R. 212).  Plaintiff's current GAF score was 65.  (R. 214).

On January 11, 2006, Plaintiff saw Dr. Tretter.  (R. 166-68).  He noted Plaintiff's chronic back pain which had been treated with nerve blocks by Dr. Rupert without much success.  (R. 166).

On January 25, 2006, Plaintiff underwent a CT scan of the lumbar spine which revealed mild posterior bulging of the L4-5 and L5-S1 disc with no evidence of anular tear.  (R. 161).

On January 25, 2006, Plaintiff also underwent a discogram.  (R. 175-76).  Dr. Rupert noted that Plaintiff had undergone diagnostic injections, median branch blocks, S1 joint injections, and epidural blocks without much effect.  (R. 175).  Plaintiff's exam revealed normal results.  (R. 176).

On February 5, 2006, Dr. Tretter wrote a letter outlining Plaintiff's impairments.  (R. 174).  He stated that Plaintiff's "current working diagnosis is fibromyalgia and depression."  (R. 174).  He explained that physical therapy and nerve blocks had been met with little to no success.  He opined as follows:

> Taking her musculoskeletal findings in to account with her other medical problems including depression and migraine headaches, it is my opinion that Susan has limited functionality to perform work-related activities. She lost her previous job due to being unable to stand or sit for prolonged periods of time, as well as difficulty with steps, and upper extremity functions such as lifting and carrying. I do not believe she has the capacity to do any of these activities on a recurring, continuous basis. Her depression has resulted in inability to concentrate or perform tasks requiring complex mental stamina.

(R. 174).

On May 15, 2006, Plaintiff visited Dr. Tretter. (R. 149-51). He diagnosed degenerative disc disease that had been exacerbated by a recent car accident. (R. 151). Dr. Tretter also noted Plaintiff's fibromyalgia and anxiety disorder. (R. 151).

On May 24, 2006, Dr. Tretter opined in a letter that Plaintiff had fibromyalgia, chronic neck, shoulder, and back pain, migraine headaches, depression, and generalized anxiety with panic attacks which limit Plaintiff's ability to work. (R. 132). Dr. Tretter opined that Plaintiff could not sit or stand for prolonged periods of time and could not perform repetitive movements with her arms. (R. 132). He also thought Plaintiff's medications would effect her use of machinery and work in high places, and he felt that anxiety and depression further limit her work-related abilities. (R. 132).

On June 16, 2006, Plaintiff was examined by Dr. Tretter. (R. 146-48). He noted Plaintiff's history of neck and back pain and fibromyalgia. (R. 146). He noted that Plaintiff had seen Dr. Rupert for nerve blocks and injections, but

she was no longer seeing him because he no longer felt that they were effective. (R. 146).

On July 5, 2006, Plaintiff visited Dr. Tretter for evaluation of her migraine headaches. (R. 130-31). Her migraines were no longer responding to her current medication; they had caused an exacerbation of her fibromyalgia, making her chronic pain much worse. She reported pain of nine on a scale of one to ten. (R. 130). Dr. Tretter suggested a change to Topomax. (R. 131).

On August 15, 2006, Plaintiff was examined by Dr. Tretter with complaints of chest pain. (R. 127-29). He advised Plaintiff that a cardiac exercise MPI should be performed, but noted that her chest pain could be secondary to fibromyalgia. (R. 128).

A cardiac stress test performed on August 17, 2006, revealed normal cardiac results. (R. 140).

On November 29, 2006, Dr. Tretter examined Plaintiff for a medicine recheck. (R. 121-23). He listed Plaintiff's medical problems as including a history of herpes simplex type II, a lower back injury, a grief reaction with anxiety, migraine headaches, fibromyalgia, irritable bowel syndrome, depression, and urinary stress incontinence. (R. 122).

On March 2, 2007, Dr. Tretter submitted a detailed letter chronicling Plaintiff's problems, which reads as follows:

> Susan Curtis is a patient under my care at Dale family Medicine. She has a history of multiple medical problems including fibromyalgia, chronic neck, shoulder and back pain, migraine

headaches, fatigue, depression and generalized anxiety with panic attacks. Occurring on a constant basis, these conditions significantly limit her daily living activities as well as her ability to perform work activities.

Ms. Curtis has presented to my office on multiple occasions with complaints of chronic, severe muscle and joint pain with persistent stiffness. On examination, greater than 11 of 18 trigger points have been noted in all four quadrants of the patient's body. She has undergone several spinal nerve blocks, steroid injections, oral medications and has a TENS unit without much therapeutic success.

Due to fibromyalgia and chronic pain, Ms. Curtis's ability to stand or walk is limited to less than 20 minutes at a time. She is only able to sit for less than 30 minutes. Her chronic fatigue and pain causes her to need to recline or lie down for at least 15 minutes every hour. She is unable to perform repetitive movements of her arms and hands. She would have difficulty maintaining a regular work schedule due to pain and fatigue. Her depression, anxiety and pain have resulted in the inability to concentrate or perform even simple repetitive tasks as well.

(R. 119). Dr. Tretter's report of March 2, 2007, is also consistent with a letter he wrote on November 3, 2006, that went into less detail about Plaintiff's limitations. (R. 120).

Plaintiff again had an office visit with Dr. Tretter on March 8, 2007, for a "disability physical." (R. 116-18). Dr. Tretter noted that Plaintiff suffers from fibromyalgia, depression, anxiety, and migraine headaches. (R. 116). He also noted Plaintiff's numerous treatments including nerve blocks, prescription medication, and massage therapy and opined that none had been particularly helpful. (R. 116). Plaintiff was taking chronic narcotic pain medication, as well as medicine for depression and migraines. (R. 116).

On May 18, 2007, Plaintiff visited Dr. Tretter.  (113-15).  He noted her multiple medical problems and opined that her worst was fibromyalgia, which he explained caused Plaintiff "extreme pain and weakness diffusely throughout her muscles and joints."  (R. 113).  He noted that Cymbalta had been "fairly effective" for Plaintiff's fibromyalgia and her depression, but that Plaintiff could not afford it.  (R. 113).  Plaintiff also reported tingling in her extremities, a "blackout" episode, and confusion.  (R. 113).  Plaintiff displayed diffuse pain in her back, neck, and extremities.  (R. 113).  Plaintiff also suffers from fatigue that Dr. Tretter believes is secondary to her numerous medical problems.  (R. 114).  Plaintiff reported smoking daily and using alcohol socially.  (R. 114).

On August 17, 2007, Dr. Tretter again saw Plaintiff.  (R. 110-12).  He noted that Cymbalta helped Plaintiff's depression symptoms but also explained that Plaintiff dealt with a great deal of joint and muscle pain, and he opined that Plaintiff had a great deal of difficulty with any persistent activity, as well as standing, walking, lifting, or any repetitive activity.  (R. 110).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material

conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant

-11-

numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of the ALJ's decision. Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 13). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe: fibromyalgia; mild posterior bulging of the L4-5 and L5-S1 discs in her back; and migraine headaches. (*Id.*) Plaintiff also had one non-severe impairment: depression. (R. 13-14). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 17). Consequently, the ALJ concluded that Plaintiff retained the RFC to lift and carry up to 20 pounds occasionally and ten pounds frequently; sit, walk, or stand for about six hours in an eight-hour work day; push and pull within the aforementioned weight restrictions; frequently climb ramps and stairs or balance; occasionally stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, or scaffolds. (R. 15). The ALJ opined that Plaintiff retained the

RFC to perform her past work as an office clerk.  (R. 22).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 23).

## VI.  Issues

Plaintiff has essentially raised four issues.  The issues are as follows:

1.  Whether the ALJ failed to give proper weight to the opinions of Plaintiff's treating/examining doctors.

2.  Whether the ALJ's failure to find Plaintiff's depression to be a severe impairment was an error.

3.  Whether the ALJ's RFC assessment took into consideration all of Plaintiff's impairments.

4. Whether the ALJ followed SSR 96-7p regarding Plaintiff's credibility.

**Issue 1:**    **Whether the ALJ failed to give proper weight to the opinions of Plaintiff's treating/examining doctors.**

Plaintiff first argues that the ALJ erred by rejecting the opinions of Plaintiff's treating physicians, particularly Dr. Tretter.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d at 870.  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*
Generally, the more knowledge a treating source has about
your impairment(s) the more weight we will give to the
source's medical opinion.  We will look at the treatment the
source has provided and at the kinds and extent of
examinations and testing the source has performed or
ordered from specialists and independent laboratories.  For
example, if your ophthalmologist notices that you have
complained of neck pain during your eye examinations, we
will consider his or her opinion with respect to your neck
pain, but we will give it less weight than that of another
physician who has treated you for the neck pain.  When the
treating source has reasonable knowledge of your
impairment(s), we will give the source's opinion more weight
than we would give it if it were from a nontreating source.

(3)  *Supportability.*  The more a medical source presents
relevant evidence to support an opinion, particularly medical
signs and laboratory findings, the more weight we will give
that opinion.  The better an explanation a source provides for
an opinion, the more weight we will give that opinion .
Furthermore, because nonexamining sources have no
examining or treating relationship with you, the weight we
will give their opinions will depend on the degree to which
they provide supporting explanations for their opinions.  We
will evaluate the degree to which these opinions consider all
of the pertinent evidence in your claim, including opinions of
treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an
opinion is with the record as a whole, the more weight we will
give to that opinion.

(5)  *Specialization.*  We generally give more weight to the
opinion of a specialist about medical issues related to his or
her area of specialty than to the opinion of a source who is
not a specialist.

(6)  *Other factors.*  When we consider how much weight
to give to a medical opinion, we will also consider any factors
you or others bring to our attention, or of which we are
aware, which tend to support or contradict the opinion.  For
example, the amount of understanding of our disability

-15-

programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f) *Opinions of nonexamining sources.* We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1) In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

In this case, from at least January 2004 to August 2007, Dr. Tretter participated in a treatment relationship with Plaintiff. Dr. Tretter consistently found evidence of numerous ailments including fibromyalgia, depression, fatigue, muscle/joint pain in Plaintiff's back, neck, and extremities, anxiety, and migraine headaches. On several occasions, Dr. Tretter opined that these

impairments would substantially limit Plaintiff's ability to engage in work-related activities. The most notable of these opinions was a letter written in March 2007 which explained that:

> Susan Curtis is a patient under my care at Dale family Medicine. She has a history of multiple medical problems including fibromyalgia, chronic neck, shoulder and back pain, migraine headaches, fatigue, depression and generalized anxiety with panic attacks. Occurring on a constant basis, these conditions significantly limit her daily living activities as well as her ability to perform work activities.
>
> Ms. Curtis has presented to my office on multiple occasions with complaints of chronic, severe muscle and joint pain with persistent stiffness. On examination, greater than 11 of 18 trigger points have been noted in all four quadrants of the patient's body. She has undergone several spinal nerve blocks, steroid injections, oral medications and has a TENS unit without much therapeutic success.
>
> Due to fibromyalgia and chronic pain, Ms. Curtis's ability to stand or walk is limited to less than 20 minutes at a time. She is only able to sit for less than 30 minutes. Her chronic fatigue and pain causes her to need to recline or lie down for at least 15 minutes every hour. She is unable to perform repetitive movements of her arms and hands. She would have difficulty maintaining a regular work schedule due to pain and fatigue. Her depression, anxiety and pain have resulted in the inability to concentrate or perform even simple repetitive tasks as well.

(R. 119). Furthermore, earlier, in May 2006, Dr. Tretter opined that Plaintiff's use of narcotics and other medications would render her unable to work with machinery and in high locations. (R. 132).

Despite these and numerous other opinions from Dr. Tretter supporting the severity of Plaintiff's condition, the ALJ concluded that Plaintiff's fibromyalgia was not as severe as she suggested. Specifically, the ALJ explained:

Although the claimant stated that she was diagnosed with fibromyalgia 2 years prior by Dr. (Harold) Moses at Vanderbilt University Medical Center, this is not consistent with Dr. Moses' actual report.  The claimant was referred to Dr. Moses by neurologist Satish Shah, M.D., after he could find no etiology for her alleged symptoms.  Dr. Moses concluded that the claimant did not have multiple sclerosis (MS) and opined that her joint pains and fatigue "may be" suggestive of fibromyalgia versus depression.  The undersigned notes that this diagnosis was not definitive (*See,* Ex. 1F, p. 239).  Although Dr. Moses reported his finding to Dr. Shah, there is no evidence of any further treatment by Dr. Shah (*See,* Ex. 1F, pp. 134-142).  Shortly after Dr. Moses' examination, the claimant sought treatment from Dr. Tretter to whom she reported that Dr. Moses felt her symptoms were related to fibromyalgia.  The evidence indicates that Dr. Tretter adopted this diagnosis based upon the claimant's self-report (*See,* Ex. 1F, p. 196).

*****

The American College of Rheumatology established criteria in 1990 for the diagnosis of fibromyalgia.  The criteria included widespread pain present for at least three months.  Pain is considered widespread when a patient has pain in ***both*** sides of the body and has pain above ***and*** below the waist.  In addition, axial skeletal pain (cervical spine, anterior chest, thoracic spine, or low back) must be present.  There must be pain in 11 of 18 specified tender point sites upon digital palpation.  To qualify, a tender point has to be painful at palpation, and not just "tender."

Although Dr. Tretter subsequently consistently listed fibromyalgia in his diagnoses, his office visit notes do not indicate that a thorough fibromyalgia examination was ever performed.  Dr. Tretter indicated on March 2, 2007 that the claimant had presented to his office on multiple occasions with complaints of chronic severe muscle and joint pain with persistent stiffness and that upon examination she had exhibited greater than 11 of 18 trigger point in all four quadrants of her body.  However, review of Dr. Tretter's actual office visit notes do not mention such trigger points up to this point (Ex. 1F, p. 12).  Office records encompassing the period from January 2004 through June 2006 primarily refer to tenderness in her cervical, thoracic, or lumbar spine (*See,* Ex. 1F, pp. 39, 42, 59, 64, 121, 164, 174, 179, 184, 189, 193).  However, since the DDS physicians recognized fibromyalgia as a medically determinable

condition, the claimant's symptoms related to this condition have
been given full consideration in the determination of her residual
functional capacity.  The undersigned notes, however, that the
claimant's complaints of pain are subjective in nature and must be
viewed in the context of her overall credibility.

(R. 14, 18).  The ALJ went on to discredit numerous opinions of Dr. Tretter

because of an alleged lack of objective medical findings.  (R. 19-22).  The ALJ

concluded:

Although DDS medical consultants recognize fibromyalgia as a
severe impairment, they also noted that her cervical MRI was within
normal limits, as was her neurological examination.  The claimant
was determined to have the residual functional capacity to lift
and/or carry 20 pounds occasionally and 10 pounds frequently,
stand and/or walk 6 hours in an 8-hour workday, sit about 6 hours
in an 8-hour workday, push/pull within the aforementioned weight
restriction, climb ramps/stairs and balance frequently, and
occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch,
or crawl (Ex. 1F, pp. 110-118).  The undersigned finds that the
evidence when viewed in its entirety continues to support the
determination of the DDS physicians and, consequently, their
findings have been adopted.

(R. 22).

The court concludes that the ALJ's reasoning for rejecting the opinions of

Dr. Tretter is flawed.  When an ALJ chooses to discount the opinions of a

treating physician, there must be medical evidence to support the ALJ's decision;

the ALJ must not simply substitute her judgment for that of a treating

physician.  *Clifford v. Apfel,* 227 F.3d at 870.  In this case, the ALJ did not

identify medical evidence from other treating or examining physicians that

supported her decision to set aside the opinions of Dr. Tretter.  Dr. Tretter

opined that Plaintiff's fibromyalgia was severe and that it provided a reasonable

medical basis for Plaintiff's pain.  Dr. Tretter's opinion was internally consistent.
Additionally, Dr. Tretter did note that Plaintiff suffered from the requisite
number of tender points to support a diagnosis of fibromyalgia.  The ALJ's
conclusion that Plaintiff's normal MRI and normal neurological results were
inconsistent with her diagnosis of fibromyalgia misunderstands the nature of
fibromyalgia.  This case is similar to *Sarchet v. Chater* where the Seventh Circuit
remanded because the ALJ "depreciated the gravity of Sarchet's fibromyalgia
because of the lack of any evidence of objectively discernable symptoms, such as
swelling of the joints."  78 F.3d 305, 307 (7th Cir. 1996).

This case is also similar to a recent decision by U.S. District Judge David
Hamilton who remanded because an ALJ rejected the opinions of treating
physicians who had diagnosed fibromyalgia.  In *Farthing v. Barnhart*, 4:04-cv-
242-DFH-WGH, Judge Hamilton explained:  "As in *Sarchet,* this reasoning
mistakenly assumes that the claimant's physicians could present objective
medical findings if confronted with a situation of legitimately disabling
fibromyalgia.  As the *Sarchet* court explained, there are no laboratory tests for
the presence or severity of fibromyalgia, and its principal discernable symptom is
multiple trigger points for pain." (Entry on Judicial Review, Docket No. 25, at
12).  Judge Hamilton continued by explaining that "[r]ejecting Ms. Farthing's
fibromyalgia diagnosis, in light of the well-documented, long-term findings by
her physicians, and without citing any contradictory medical report or opinion
amounts to 'playing doctor' in this situation."  *Id.* at 13.  Judge Hamilton

concluded by questioning what medical evidence the ALJ could have relied on to form a RFC finding.  He found that "[t]he only evidence in the record potentially supporting the ALJ's finding is the RFC assessment form completed by two state agency medical consultants . . . .  The opinions of non-examining physicians, however, cannot constitute substantial evidence if contradictory treating or examining physician evidence is in the record."  *Id.* at 14-15 (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The ALJ appears to have taken the same actions as were taken in *Farthing v. Barnhart*, and this approach warrants remand.  First, the ALJ pointed to a lack of objective medical tests to support Dr. Tretter's findings.  However, Plaintiff's physicians did exactly what was required of them in making a diagnosis of fibromyalgia; they ruled out all other sources of Plaintiff's pain, they noted significant fatigue, they noted skeletal pain (in Plaintiff's spine), and they noted the requisite tender points.  Second, the ALJ did not point to any medical evidence from treating or examining sources that contradicted Dr. Tretter.  And third, the ALJ simply relied on the opinions of state-agency doctors who had never seen Plaintiff.  Because the ALJ improperly discounted the opinions of Dr. Tretter with no contradictory medical evidence from other sources, the decision of the ALJ must be remanded.  On remand, the ALJ is free to order a consultative exam.

**Issue 2:**   **Whether the ALJ's failure to find Plaintiff's depression to be a severe impairment was an error.**

Plaintiff also asserts that the ALJ committed error when she failed to find Plaintiff's depression to be a severe impairment.  However, the ALJ did find that Plaintiff suffered from three severe impairments.  The ALJ then went on to analyze Plaintiff's depression and determined that it was not a severe impairment.  There was nothing improper about the ALJ's failure to label Plaintiff's depression a severe impairment.  As U.S. District Judge David Hamilton has indicated, "[a]s long as the ALJ proceeds beyond step two, . . . . no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments-'severe' and 'not severe'-on her ability to work."  *Gordon v. Astrue*, 2007 WL 4150328, at *7 (S.D. Ind., Nov. 13, 2007).  Here, because the ALJ proceeded beyond step two, her failure to label Plaintiff's depression a severe impairment does not warrant remand.

**Issue 3:**   **Whether the ALJ's RFC assessment took into consideration all of Plaintiff's impairments.**

Next, Plaintiff finds fault in the ALJ's RFC assessment.  However, the court notes that remand is already necessary because of the ALJ's analysis of Plaintiff's fibromyalgia, and the ALJ will be required on remand to conduct a new RFC assessment after she has properly evaluated Plaintiff's fibromyalgia.  Unless

there is medical evidence from acceptable medical sources to support the ALJ's

decision to reject the opinions of Dr. Tretter, the ALJ will be required to give

controlling weight to Dr. Tretter's findings and incorporate them into the RFC

assessment.  The court specifically notes that Dr. Tretter opined that Plaintiff's

medication would limit her to no contact with machinery and no work in high

places.  This opinion was not contradicted by any other treating or examining

doctor's opinion.  The ALJ must take note of this opinion and incorporate it into

Plaintiff's RFC unless she can point to contradictory medical evidence.

**Issue 4:      Whether the ALJ failed to follow SSR 96-7p regarding Plaintiff's credibility.**

Finally, Plaintiff argues that the ALJ conducted a flawed credibility

determination.  An ALJ's credibility determination will not be overturned unless

it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  Here,

the ALJ's "credibility" decision is more properly an evaluation of Plaintiff's

complaints of pain.  The ALJ must, therefore, not only consider SSR 96-7p, the

regulation promulgated by the Commissioner to assess and report credibility

issues, but also 20 C.F.R. § 404.1529(c)(3).

Social Security Ruling 96-7p states that there is a two-step process that

the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical
> and laboratory diagnostic techniques--that could reasonably be
> expected to produce the individual's pain or other symptoms.  The
> finding that an individual's impairment(s) could reasonably be

expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added).  SSR 96-7p further provides that the ALJ's

decision regarding the claimant's credibility "must contain specific reasons for

the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ's credibility determination in this case was as follows:

> After a thorough examination of the claimant's assertions regarding the intensity, persistence, and limiting effects of her alleged symptoms, and all other pertinent evidence within the scope of Social Security Ruling 96-7p and 20 CFR 404.1529, the undersigned finds that her statements concerning the severity and extent of her alleged ongoing exertional and nonexertional limitations and their impact on her ability to work are not fully credible.  Although the claimant has numerous subjective complaints, the objective medical evidence contained in the record does not support the degree of limitations alleged.  The inconsistency in the claimant's reports regarding the reasons she lost her last job also tends to undermine her credibility.

(R. 17).  The court concludes that this rationale is inconsistent with the requirements of SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(i)-(vii).  First, the court notes that the record indicates that Plaintiff believed that she was terminated from Whirlpool because of her impairments, but the reasons Whirlpool gave were that Plaintiff had deleted files.  This does not reflect poorly upon Plaintiff's credibility.  Second, Plaintiff was diagnosed with fibromyalgia, and, as discussed above, the ALJ was not permitted to discount the debilitating effects of Plaintiff's fibromyalgia simply because of a lack of objective medical evidence.  Additionally, the ALJ failed to note that there was objective medical evidence to support Plaintiff's complaints of debilitating migraine headaches.  It was noted in the medical evidence that Plaintiff's abnormal brain scan showing lesions was indicative of migraine headaches.  Furthermore, the ALJ failed to consider whether the litany of medications, including narcotic pain medication, could have supported Plaintiff's complaints of pain as well as the extent of her limitations.

While the ALJ was faced with a daunting task in this case, this court cannot conclude that a full analysis of Plaintiff's pain was completed in this case.  On remand, the ALJ must follow SSR 96-7p and  20 C.F.R. § 404.1529(c)(3)(i)-(vii) concerning credibility and pain, and must discuss why, even given Plaintiff's migraine headaches, her diagnosis of fibromyalgia, and her use of numerous medications, Plaintiff's complaints of pain are not credible and do not substantially limit her functioning.

## VII.  Conclusion

The ALJ did not give proper weight to the opinions of Dr. Tretter. Additionally, remand is necessary to more clearly evaluate pain in accordance with SSR 96-7p.  Finally, the ALJ must perform a new assessment of Plaintiff's residual functional capacity, taking into account all of Plaintiff's impairments, including the effects of her medication.  The final decision of the Commissioner is, therefore, **REMANDED.**

**SO ORDERED** the 18th day of May, 2009.

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov